IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 18, 2001

## STATE OF TENNESSEE v. DAVID WALTER TROXELL

**Direct Appeal from the Circuit Court for Dickson County**
**No. CR-4933     Robert Burch, Judge**

---

**No. M2000-01100-CCA-R3-CD - Filed May 8, 2001**

---

Defendant, charged with possession with intent to sell and/or deliver a controlled substance and possession of drug paraphernalia, filed a motion to suppress over 300 grams of cocaine, paraphernalia, and U.S. currency discovered during a search of his vehicle. The trial court, Dickson County, granted Defendant's motion to suppress the evidence on the ground that the search impermissibly exceeded the scope of Defendant's consent. The State appealed. After a review of the record, we reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Paul G. Summers, Attorney General and Reporter; Marvin E. Clements, Jr., Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Kim Menke, Assistant District Attorney General, for the appellant, State of Tennessee.

William B. (Jake) Lockert, III, District Public Defender, Ashland City, Tennessee, for the appellee, David Walter Troxell.

### OPINION

### I. Facts

Trooper Mark Norrod of the Tennessee Highway Patrol testified at the suppression hearing that on November 11, 1999, he stopped Defendant, David Walter Troxell, for driving his pick-up truck at a speed of 78 to 80 miles per hour in a 70 mile per hour zone. Consistent with standard police procedure, Norrod first questioned Defendant regarding ownership of the truck. Defendant responded that the vehicle was owned by Defendant's employer but Norrod testified that, in fact, the vehicle was registered to Defendant's wife. Defendant did not deny that he had been speeding. Norrod explained to Defendant why he had been stopped, then issued him a warning ticket for the speeding violation. By this time, an additional officer, Trooper Ferrell, had also arrived on the scene.

Norrod further testified that prior to giving Defendant the warning ticket, he asked him whether he had "any weapons in the vehicle." Trooper Ferrell was present and standing nearby when Norrod made this request. When Defendant replied, "No," Norrod requested permission to take a look and Defendant replied, "Go ahead." Norrod testified that Defendant did not place any limitations on where Norrod was permitted to search, and Norrod did not limit his request other than by specifying that he desired to search "in the vehicle." In Norrod's mind, permission to search "in the vehicle" implied that he could search the "entire vehicle."

Norrod then proceeded to search the interior of the vehicle. After completing a search of the cab area of the truck and the luggage contained therein, Norrod continued his search by examining the underside of the vehicle. At this point, Norrod noticed that the gas tank had been tampered with; it appeared that the tank had been "dropped." Moreover, the hoses and the bolts holding the gas tank both looked as though they "had been off recently." Crawling underneath the trailer portion of the truck with a flashlight and mirror, Norrod observed that "silicone [was] used to reinsert the sending unit." In addition, the gas tank did not resonate when Norrod tapped upon it, as a normal fuel tank would do. Norrod testified that, according to his experience in drug-interdiction work, these circumstances indicated that something other than gasoline was contained in the gas tank and "it could have been [weapons]." Norrod acknowledged that modifications such as these, e.g., tampering with the gas tank and silicone seals, are the sort of thing that police officers keep their eye out for since they often indicate that contraband, including illegal drugs, has been stored or hidden in a vehicle.

Norrod testified that he requested Defendant follow the troopers to a nearby gas station to check the fuel tank because he believed that something was hidden inside. Defendant agreed to let them inspect the fuel tank, and then voluntarily accompanied the troopers to the gas station for this purpose. When they discovered approximately ten kilos of cocaine inside the fuel tank, Defendant was arrested. Norrod testified that he did not threaten, coerce, or intimidate Defendant to secure his cooperation in driving to the gas station. Norrod admitted that Defendant had asked the troopers to seek permission to search the gas tank from the owner of the vehicle and that he had agreed but did not comply. Instead, Norrod informed Defendant that no cost would be incurred by Defendant's employer or by Defendant himself.

During cross-examination, Norrod testified that Defendant "stood over to the side" with Trooper Ferrell during the search. He explained that positioning Defendant in this manner allowed the video camera which was mounted on the police car to accurately and completely videotape the incident and was also prudent for security and safety reasons. Norrod admitted that he did not ask Defendant whether he was carrying drugs but inquired only about weapons. Norrod also conceded that the way his request was phrased, it was reasonable to construe it as one which concerned weapons only. Norrod also admitted that he had a drug detection dog with him and that he conducted a canine sweep of the vehicle after he examined the underside and tapped on the gas tank. Although Norrod testified that when he requests permission to search a person's truck he considers the request to mean "anywhere," he agreed that "most people might reasonably think that would mean [he was] going to look inside the cab of their truck." On redirect examination, Norrod testified

that after Defendant granted him permission to search, Norrod began by searching Defendant's person. Defendant did not object to the search of his person or the vehicle at any point during the encounter.

At the suppression hearing, Defendant testified that he had assumed Norrod's search request would include "just the area that [Defendant] had immediate access to, which would be the cab" and his person. Defendant claimed that it never occurred to him that Norrod would look underneath his truck with mirrors or that he would examine the gas tank. During cross-examination, Defendant admitted that he did not object to Norrod patting him down and that he did not ask the troopers to quit searching when Norrod began looking underneath the truck. In fact, Defendant conceded that he made no objections to any part of the search. However, Defendant also claimed that from where he was positioned during Norrod's search, he was "not within verbal reach" of Norrod. Defendant further conceded that he did not feel "threatened," but that "to be pulled over on the side of the road when conducting business, and have two highway patrol officers with a K-9 unit – to have you there for any length of time, it's intimidating." Defendant stated that "when [the troopers] asked [Defendant] to follow them to the station and said that they were going to contact the owner of the vehicle, and for them to do so . . . that's a form of coercion." Contrary to feeling "threatened," Defendant claimed that the incident was a "nuisance" and "irritating, to say the least."

The videotape recorded during Defendant's encounter with Norrod was played for the court at the suppression hearing and revealed the following relevant facts: contrary to Norrod's testimony, Norrod issued Defendant a warning ticket (effectively concluding the reason for the traffic stop) *before* he began to question Defendant concerning weapons in his vehicle. Immediately after issuing the ticket, Norrod asked Defendant, "Do you have any weapons in the vehicle?" and Defendant replied, "Nothing." Norrod then asked Defendant whether he could "take a look?" After Defendant replied, "Yeah, go ahead," Norrod asked Defendant, "You don't have anything on you, do ya?" whereupon Defendant responded that he did not. Norrod and Defendant then engaged in an apparently amicable conversation as Norrod proceeded to pat him down. Afterward, Norrod turned his attention to searching the vehicle.

The videotape also showed that approximately nineteen minutes transpired from the time that Norrod began to search Defendant's person to the moment Norrod began to explain to Defendant that his gas tank looked suspicious. Also, contrary to Defendant's testimony during the suppression hearing, Defendant appeared to be located well within earshot of Norrod during the search of the vehicle. Although the visual quality of the videotape leaves much to be desired, Trooper Ferrell could also be seen standing to the right of Defendant's vehicle, approximately five feet from the back of the truck, during the search. If Ferrell and Defendant were standing together at this time, we can reasonably infer that Defendant was in the immediate vicinity and, thus, also within "verbal reach" of Norrod.

The videotape also raised doubt concerning Defendant's claim about the condition he allegedly imposed on his consent. In his brief, Defendant argues that he conditioned his consent to search the gas tank on Norrod's ability to secure permission from the "owner" of the truck.

According to the videotape, however, Norrod's discussion with Defendant concerning this matter concluded with Defendant's statement that the search was "O.K." with him as long as Norrod "notified" the owner what they were doing. Defendant then followed Norrod to the gas station where the gas tank was "dropped" and ten kilos of cocaine were discovered.

At the conclusion of the suppression hearing, the trial court determined that Trooper Norrod's search of the underside of Defendant's truck exceeded the scope of Defendant's consent. As a result, the cocaine seized as a result of the search was inadmissible under Fourth Amendment principles. The trial court stated that "when someone asks to look for weapons . . . they conduct [a search] for weapons in the inside of the – of the vehicle."

## II. Standard of Review

The standard by which an appellate court reviews a trial court's findings of fact on suppression issues is as follows:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, this Court is not bound by the trial court's conclusions of law. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this Court reviews de novo. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999) (citing State v. Yeargan, 958 S.W.2d 626, 629 (Tenn.1997)).

In this case, the trial court heard the testimony of two witnesses, and the material facts contained in the record which are necessary to decide the issue regarding the scope of the search are basically undisputed. Both witnesses agreed that consent to search "in the vehicle" was given. Where the facts are not disputed and, as a result, the trial court's ruling on a particular matter is based upon a conclusion of law derived from an application of the law to the undisputed facts of the case, de novo review is proper. See Daniel, 12 S.W.3d at 423-24. Because the trial court's conclusion that the search in issue extended beyond the permissible scope is a conclusion of law derived from an application of the law to the undisputed material facts, we apply de novo review in determining whether the trial court erred in granting Defendant's motion to suppress.

# III. Analysis

The Fourth Amendment to the United States Constitution provides that the people shall "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." Similarly, Article 1, section 7 of the Constitution of Tennessee guarantees "that the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ." The respective constitutions are identical in intent and purpose. See State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (citing Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968)). The purpose of this particular prohibition is to safeguard the privacy and security of individuals against arbitrary invasions by law enforcement officials. Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). Official action in the form of a search or seizure must be authorized in the form of a warrant which particularly describes "the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

Unless a specifically established and well-delineated exception exists, a search conducted without a warrant is per se unreasonable. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (citations omitted). Consequently, under both the federal and state constitutions, evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly-defined exceptions to the warrant requirement. Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971); State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996). The constitutional prohibitions against unreasonable searches and seizures and the accompanying warrant requirement encompass stops and searches of automobiles. Keith, 978 S.W.2d at 865. And, when the state seeks to introduce evidence seized as the result of a stop and warrantless search of a vehicle, the burden of proof rests upon the State to show, by a preponderance of the evidence, that one of the narrowly-defined exceptions to the warrant requirement existed. Id.; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). A search that is conducted pursuant to a voluntarily given consent is one such exception, so long as the consent was given freely and voluntarily. Schneckloth, 412 U.S. at 248-49; Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); Bartram, 925 S.W.2d at 230.

As a preliminary matter, we observe that Norrod's initial stop of Defendant's truck was proper based on Defendant's violation of the posted speeding limit. Tenn. Code Ann. § 55-8-152 (1997). It is well-settled that the stop of an automobile is constitutionally reasonable, under both the state and federal constitutions, if the police have probable cause or reasonable suspicion to believe that a traffic violation has occurred. Delaware v. Prouse, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997) (citing Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)); State v. Pulley, 863 S.W.2d 29, 30 (Tenn.1993). Since Defendant did not dispute that he was driving in excess of the posted speed limit, Norrod clearly had probable cause for a traffic stop.

After Norrod issued Defendant the warning ticket, the initial justification for the traffic stop and seizure concluded. Moreover, when the traffic stop ceased to be a detention and Defendant voluntarily consented to additional questioning, he was no longer "seized" for purposes of Fourth Amendment analysis. See United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir.1997) (holding that traffic stop ceases to become a detention and becomes a consensual encounter when police officer returns license and registration unless driver has "objectively reasonable" cause to believe that he or she is not free to leave); State v. Ashworth, 3 S.W.3d 25, 30 (Tenn. Crim. App. 1999) (citing United States v. Sullivan, 138 F.3d 126, 133 (4th Cir.1998), for its holding that detention ended when police officer returned driver's license and registration and driver voluntarily consented to additional questioning). The videotape shows that Norrod made the following statement to Defendant: "What I did is wrote you a warning for your speed. There's no fine, no court appearance; it doesn't go on your record. It's just a warning. Now watch your speed limit." Immediately after Defendant acknowledged receipt of the warning, he voluntarily responded to additional questioning when Norrod inquired whether Defendant had weapons in the vehicle. A "seizure" implicating constitutional concerns occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. State v. Daniel, 12 S.W.3d 420, 425 (Tenn. 2000) (citations omitted). Under the circumstances presented in the videotape, a "reasonable person" would have believed that he or she was free to leave after Norrod issued the warning ticket, and Defendant has not claimed otherwise.

The issue expressly before this Court is whether the trial court erred when it granted Defendant's motion to suppress cocaine discovered as the result of examining the underside of Defendant's vehicle. Specifically, the trial court determined that Trooper Norrod's search of the *underside* of Defendant's truck exceeded the scope of Defendant's consent, thereby rendering it unreasonable under Fourth Amendment principles. The trial court stated that "when someone asks to look for weapons . . . they conduct [a search] for weapons in the inside of the – of the vehicle." The State contends that the trial court erred, arguing that the underside of Defendant's vehicle was reasonably within the scope of a search for weapons and, even if Defendant's initial consent did not extend to the gas tank area, Defendant effectively extended his consent by not objecting at any time during the contested procedure. For reasons which follow, we reverse the trial court's judgment granting Defendant's motion to suppress.

It is undisputed that Defendant consented to Norrod's request to search his vehicle for weapons. Consent does not have a talismanic effect on the fruits of a search, however. Even if it is determined that consent was given and voluntary, it does not necessarily follow that the evidence seized as a result will be admissible. When the police rely on consent in lieu of a warrant as the basis for a search, they have no more authority than they have *apparently* been given by the consent. See Wayne R. LaFave, Search and Seizure, § 8.1(c) (3d ed. 1996). The scope of a consensual search is determined by the terms of the actual consent. United States v. Strickland, 902 F.2d 937, 941 (11th Cir. 1990). And, the standard for measuring the scope of a suspect's consent under the Fourth Amendment is "that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect." Florida v. Jimeno, 500 U.S. 248,

251, 111 S.Ct. 1801, 1803-1804 (1991). The understanding of a "typical reasonable person" will generally depend, in turn, upon the expressed object of the search. Id.

Defendant argues that Norrod's search of the underside of the vehicle was outside the scope of his consent because at the time Defendant consented, he believed Norrod's request to search for weapons was limited to the interior of the cab of his truck. We disagree. In Jimeno, the United States Supreme Court concluded that, when the officer informed the motorist that he was searching for narcotics, it was objectively reasonable for the officer to conclude that a general consent to search the motorist's vehicle included consent to search containers within the vehicle that might contain drugs. Id. In a similar vein, it was objectively reasonable for Norrod to conclude that Defendant's consent to search "in the vehicle" would encompass a look at the easily accessible underside of Defendant's truck, an area which could reasonably contain or be used to hide weapons. See e.g., United States v. Zapata, 180 F.3d 1237, 1243 (11th Cir.1999) (a police officer did not exceed the scope of a general consent when he removed an interior door panel of an automobile with his fingers, dislocating two plastic clips; "a search does not exceed the scope of consent merely because an officer forces open a secured compartment that may reasonably contain the objects of the search"); United States v. McRae, 81 F.3d 1528 (10th Cir. 1996) (where consent was obtained to search a car for drugs, officers did not exceed scope when they lifted the carpet in the trunk); United States v. Wacker, 72 F.3d 1453 (10th Cir. 1995) (where defendant gave police officer permission to search the vehicle for guns or contraband, the consent covered both the cab of the truck and the rear camper shell area); United States v. McSween, 53 F.3d 684 (5th Cir. 1995) (where defendant gave general permission to search his vehicle, a search of the area under the hood was permissible); United States v. Martinez, 949 F.2d 1117 (11th Cir. 1992) (a general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items). It makes no practical sense to differentiate between searches of areas such as those previously ruled "permissible" above and searches of the areas underneath a vehicle, as in Defendant's case.

We are mindful that the scope of a search permissible by a general consent and constrained by the "bounds of reasonableness" is defined by the circumstances on a case-by-case basis. For example, searches during which the officer invades locked containers, destroys private property, or investigates areas where the object of the search could not reasonably be found are in danger of exceeding the scope. See e.g., Florida v. Jimeno, 500 U.S. at 251, 111 S.Ct. at 1804 ("It is very unlikely to think that a suspect, by consenting to the search of [the trunk of his car], has agreed to the breaking open of a locked briefcase within the trunk. . . . ."); United States v. Zapata, 180 F.3d 1237, 1243 (11th Cir.1999) ("a search exceeds the scope of consent when an officer destroys a vehicle, its parts, or its contents"); United States v. Strickland, 902 F.2d 937 (11th Cir. 1990) (general consent to search vehicle did not authorize officer to slash open the spare tire); State v. Garcia, 986 P.2d 491, 494 (N. M. App. Ct.) ("when the search involves intentional damage to property, the courts require more certain evidence that the scope of the consent extended that far"); See generally Wayne R. LaFave, Search and Seizure, § 8.1(c), 610-614 (3d ed. 1996). After a review of the facts and the relevant case law, we conclude that it is entirely feasible that weapons may be concealed on the underside of a vehicle and, therefore, Norrod's search did not exceed the "bounds of reasonableness" for a constitutional search. In other words, since Defendant gave his consent to search "in the

vehicle" for weapons, and Trooper Norrod confined his search to those areas wherein weapons might be contained, the scope of Norrod's search was not impermissibly broad.

Significantly, we note that Defendant failed to object to Norrod's search of the underside of the vehicle at any point while it was being conducted. Although a failure to object cannot be unequivocally treated as expanding a limited consent, it is an indication that the search was within the "scope" of the contemplated search. See United States v. Gordon, 173 F.3d 761, 765 (10th Cir. 2000) ("we consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of the consent" (citations omitted)); United States v. McSween, 53 F.3d 684 (5th Cir. 1995) (where defendant gave general permission to search his vehicle, this was deemed to include the area under the hood in light of absence of objection); State v. Garcia, 986 P.2d 491, 493-494 (N. M. App. Ct.) ("courts have given broad scope to a consent to a general search of a vehicle for narcotics, interpreting the consent to include non-destructive dismantlement of parts of the vehicle, particularly when the defendant was present at the time and voiced no objection"); cf. United States v. Wald, 216 F.3d 1222 (10th Cir. 2000) (nonobjection by defendant not significant where failure to object stemmed from belief that he was currently under arrest and therefore had no power to prevent the search).

Defendant responds by claiming that Norrod kept him "in a position where he could not object." Defendant argues that he was "detained" and, therefore, not within "verbal reach" of Norrod during the portion of the search in issue. We disagree. As previously noted, the videotape suggests otherwise, indicating that Defendant was located in the immediate vicinity during the search. The videotape also reveals no indication that Defendant was "detained" or that he may have been intimidated into compliance by the troopers's conduct. Although the scope of Defendant's initial consent did not authorize Norrod's removal of the gas tank, the record reveals that Defendant consented to this also, and then voluntarily followed the troopers to the gas station in his truck so that it could be accomplished.

We further observe that Defendant's consent to search inside the gas tank was not necessary under the circumstances in this case. To briefly recount, after Norrod completed a search of the cab area of the truck and the luggage contained therein, he examined the underside of Defendant's vehicle which we have determined was within the permissible scope of a general consent to search "in the vehicle for weapons." At this time, Norrod noticed that the gas tank had been "dropped" and that it did not resonate when Norrod tapped upon it, as a normal fuel tank would do. In addition, the hoses and the bolts holding the gas tank both looked as though they "had been off recently." Crawling underneath the rear portion of the truck with a flashlight and mirror, Norrod observed that "silicone [was] used to reinsert the sending unit." Considered in toto, these circumstances indicated to Norrod that something other than gasoline was contained in the gas tank, namely, "weapons or other items, like drugs." Norrod acknowledged during his testimony that peculiarities such as these are the sort of thing that police officers keep their eye out for, since they often indicate that contraband has been concealed. Since Norrod's suspicions that criminal activity had been committed were aroused during the legitimate performance of his duties, i.e., while conducting a search within

the scope and pursuant to valid consent, he acquired probable cause to legally extend his search into the area of the gas tank with or without Defendant's permission. See Joseph G. Cook, Constitutional Rights of the Accused; Pretrial Rights § 46 (1972) ("If in the process of giving the traffic citation the officer gains probable cause as to another offense, he will be justified in arresting and carrying out a reasonable search in regard to such offense."). Trooper Norrod was experienced in drug-interdiction work, and the Supreme Court of the United States has made it clear that the expertise and experience of the officer are to be taken into account in applying the Fourth Amendment probable cause test. Id. (citing Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948)).

As a final matter, we observe that a search warrant was not necessary in Defendant's case once probable cause was established. See United States v. Nelson, 459 F.2d 884, 887 (6th Cir.1972) ("Exigent circumstances" exceptions to the general requirement for a search warrant include searches of automobiles.); Cash v. Williams, 455 F.2d 1227 (6th Cir.1972) (warrantless search of vehicle was valid because vehicle can be quickly moved out of locality or jurisdiction); Houston v. State, 593 S.W.2d 267 (Tenn. 1980), overruled on other grounds, State v. Brown, 836 S.W.2d 530 (Tenn. 1992) (warrantless search of vehicle allowed with consent of owner or where officer has probable cause to believe the vehicle contains evidence of a crime and that the vehicle may escape before a search warrant can be obtained).

In sum, we hold that Defendant's consent to search "in the vehicle for weapons" encompassed the easily accessible areas underneath the vehicle. The officer then acquired probable cause to extend the search to the interior area of the gas tank based on his observations during a constitutional search conducted within the permissible scope. Having decided that the scope of Norrod's search was not impermissibly broad according to Fourth Amendment principles, we further find that the seizure of cocaine was not improper, even though the search was initially for weapons. See United States v. Sanchez, 89 F.3d 715 (10th Cir. 1996) (though consent search of vehicle was for weapons, when police saw plastic bundle wrapped in duct tape with white powder substance on it, probable cause justified a seizure); State v. Bridges, 963 S.W.2d 487 (Tenn. 1997) (seizure of evidence concerning crimes unrelated to reason for initial search may be allowable under plain view doctrine).

### IV. Conclusion

For the foregoing reasons, we reverse the trial court's order granting the motion to suppress the evidence and remand this matter for further proceedings consistent with this opinion.

_____
THOMAS T. WOODALL, JUDGE